636 So.2d 1138 (1994)
Leroy CELESTINE, et al., Plaintiffs-Appellees-Appellants,
v.
UNION OIL COMPANY OF CALIFORNIA, Defendant-Appellant-Appellee.
No. 93-1330.
Court of Appeal of Louisiana, Third Circuit.
May 4, 1994.
Rehearing Denied June 20, 1994.
*1139 J.B. Jones Jr., Cameron, for Leroy Celestine et al.
Randall Kurt Theunissen, Lafayette, for Union Oil Co. of California.
Allen L. Smith Jr., Lake Charles, for Gulf Coast Marine Fabricators.
Before LABORDE, YELVERTON and KNOLL, JJ.
KNOLL, Judge.
The issue presented in this appeal is whether an owner can be liable in strict liability to a repairman for injuries caused directly from the defect, vice or ruin being repaired.
Union Oil Company of California (Union) appeals a jury verdict which held it strictly liable for personal injuries which Leroy Celestine, a welder employed by Gulf Coast Marine Fabricators, Inc. (Gulf Coast), an independent contractor hired by Union, sustained when a handrail fell on his back while he performed contract repair work on an offshore drilling platform. Celestine also appeals, contending that the jury was manifestly erroneous in finding no negligence on the part of Union and two of its employees on the offshore drilling platform. We reverse the jury's finding that Union was strictly *1140 liable and affirm the jury verdict that neither Union nor its employees were negligent. We also reverse the trial court judgment in favor of the intervenors, Gulf Coast Marine Fabricators, Inc. and Highland Insurance Company, awarding reimbursement for worker's compensation benefits. Finding no liability on Union and its employees, we pretermit Celestine's assertion of inadequate damages and the jury's assessment of 40% comparative fault to Celestine.

FACTS
Union had engaged Gulf Coast, an independent contractor, to do repair and replacement work on one of its offshore stationary platforms, namely, West Cameron 593. The work entailed the repair of rusted floor grating and handrails, and the replacement of handrails set in sockets with handrails welded directly to the platform deck.
Pursuant to its contract, Gulf Coast sent three employees to the Union platform; Gary Beaubouef was the foreman/pusher for Gulf Coast, Celestine was the welder, and additional manual labor was supplied by two roustabouts, Jason Bertrand and Jeff Biabeff. Union's foreman on the platform showed Beaubouef which metal handrails had to be replaced or repaired because of their condition from the salt water. As these handrails were selected, they were marked as the ones to be repaired. Approximately 80% of the handrails had to be changed. The handrail Celestine was working on at the time of the accident is one that was marked for repair.
At approximately the end of the second week on the job, Gulf Coast employees were working on handrails on the second level of the platform. At the time of the accident, Celestine was re-moving a five foot section of handrailing being changed from a socket connection to direct placement on the platform floor. The handrail was made up of three horizontal pieces of pipe attached to two vertical pipes. Sockets were welded to a metal plate and the plate was welded on both ends to an I-beam which ran along the perimeter of the platform. Celestine's job was to cut the plate from the I-beam and remove it.
Celestine wore a safety belt and a life jacket. As he welded, he leaned over the bottom pipe at one end of the handrail, extending the upper part of his body over the edge of the platform. Jeff Biabeff, Celestine's co-employee, held the five foot section of handrailing on the opposite end from that where Celestine was welding. As Celestine cut through the weld on one end of the plate which held the handrailing to the platform, the plate on the opposite end from the I-beam disconnected. Biabeff was unable to restrain the downward movement of the disconnected metal and the handrail fell on Celestine's back causing injury.
Celestine was sent ashore for medical examination and treatment. Initially Dr. Corbett LeBoueff conservatively treated Celestine for three months and then referred him to Dr. Clifton Shepherd, an orthopedic surgeon. Diagnostic tests revealed two herniated lumbar discs. In January of 1991, Dr. Shepherd removed the two discs without fusion of the vertebrae. When Celestine's pain became unbearable in the later part of 1991, Dr. Shepherd performed a second operation to fuse the spine at the location of the disc herniations.
At the time of trial, it was medically determined that the fusion was unsuccessful and that Celestine declined further surgery. Dr. Shepherd assigned Celestine with a 10-15% permanent impairment of the body as a whole. It was generally agreed at trial that Celestine was unable to return to his work as a welder and that he would be restricted to minimum wage jobs.
The jury found no negligence on the part of Union or its employees, but did find that a premises defect existed on Union's stationary platform which created an unreasonable risk of injury to Celestine. The jury apportioned fault 60% to Union and 40% to Celestine, and made the following awards: $68,429.80 in medical expenses; $82,992 for loss of income; $57,372 in general damages; and $20,000 for loss of consortium. The trial court further recognized the intervention of Celestine's employer, Gulf Coast, and its worker's compensation insurer, Highlands Insurance Company, and awarded them reimbursement of *1141 $102,431.50 for worker's compensation benefits. The trial judge denied all aspects of the motions for judgment notwithstanding the verdict filed by Union and Celestine, except to increase the damage award to provide general damages of $150,000 and to provide Celestine with loss of wages in the amount of $257,317. These appeals followed.

STRICT LIABILITY FOR REPAIRMAN
Union, relying on Ladue v. Chevron, U.S.A., Inc., 920 F.2d 272 (5 Cir.1991), argues that the strict liability articles should not be read to extend an owner's liability to the employee/repairman of an independent contractor who is injured by the condition he was hired to repair.[1] Celestine counters by arguing that the defect which caused the collapse of the handrail and which forms the basis of his claim in strict liability was a latent defective weld, not a rusted weld. Celestine further argues that the jury erred in finding no negligence on the part of Union and its employees.
Strict liability for things in one's custody is found in LSA-C.C. Art. 2317:
"We are responsible not only for the damage occasioned by our own act, but for that which is caused by the act of persons for whom we are answerable, or the things which we have in our custody. This, however, is to be understood with the following modifications."
One of these modifications is found in LSA-C.C. Art. 2322:
"The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by neglect to repair it, or when it is the result of a vice in its original construction."
In order to impose liability under Art. 2322 on the owner of the building, there must be: (1) a building; (2) defendant must be the owner; and (3) there must be a "ruin" caused by a vice in construction or neglect to repair. Olsen v. Shell Oil Co., 365 So.2d 1285 (La. 1978).
Liability under LSA-C.C. Art. 2315 imposes the same requirements as Art. 2317, the difference in the two articles being, under the theory of negligence, plaintiff must show that the owner knew or should have known of the risk, whereas under strict liability, the plaintiff is relieved of proving defendant's scienter. Eldridge v. Bonanza Family Restaurants, 542 So.2d 1146 (La. App. 3 Cir.1989). Under either theory of liability, the plaintiff has the burden of proving: (1) the property which caused the damage was in the custody of the defendant; (2) the property was defective because it had a condition that created an unreasonable risk of harm to persons on the premises; and, (3) the defect in the property was a cause-in-fact of the resulting injury. Id. In both negligence and strict liability cases, the reasonableness of the risk is determined by balancing the probability and magnitude of the risk against the utility of the thing. Id.
Union cites Ladue, supra, as a case very similar to the case sub judice, and with which we agree is the applicable law in Louisiana on this issue. Ladue concerned a roustabout who was employed by an independent contractor. He was hired to replace decayed deck grating on an offshore mineral-production platform and was injured when a piece of the deck grating gave way under his weight. He brought suit alleging that the platform owner was strictly liable under LSA-C.C. Art. 2317 and 2322. The United States District Court for the Eastern District of Louisiana granted defendant's motion for summary judgment, and the United States Court of Appeals, Fifth Circuit, with the esteemed Albin B. Rubin, Circuit Judge, as organ for the court, affirmed, stating at 277 and 278:

*1142 "Whether a particular risk of harm is reasonable cannot be determined in a vacuum. The phrase `unreasonably dangerous', in the words of Louisiana's late distinguished Professor Wex S. Malone, `has no discernible content of its own and ... must acquire its meaning solely from the environment attendant on each of the variety of disputes in which it is put to use.' Unlike the regime of strict products liability, which uses the `ordinary consumer' as its benchmark, Louisiana's scheme of strict liability under Articles 2317 and 2322 posits no constant person or persons, mythical or real, with respect to whom the reasonableness of a given risk is to be measured. For that reason, the Louisiana courts have found themselvesunder the rubric of assessing a risk `under all of the circumstances of a particular case'determining the reasonableness of a given risk `vis-a-vis the plaintiff,' or more accurately, vis-a-vis the plaintiff and those similarly situated. Therefore, we need not determine whether the grating on Chevron's platform was unreasonably dangerous with respect to the world at large, or even with respect to the Chevron employees who performed their daily work on the platform. We need only determine whether the grating was unreasonably dangerous with respect to Ladue and those similarly situated.
The risk faced by Ladue and his fellows was entirely reasonable. The deck grating was a basic and essential part of the platform, a structure with obvious social and economic benefits. Because this is so, the community as a whole is served by the owner's efforts to maintain the grating. The better rule of law, therefore, would encourage the owner to repair the platform, for that is the `socially and economically desirable' state of affairs.
This conclusion is supported by the principles underlying articles 2317 and 2322. Article 2322, for example, specifically imposes liability either where the building's `ruin' is caused by a `vice in its original construction,' or by the owner's `neglect to repair it.' The owner's `fault rests upon his failure to prevent the risk-creating harm and upon his obligation to guard against the condition ... which creates the unreasonable risk of harm.' One way to discharge that obligation is by repairing a potentially dangerous condition. Articles 2317 and 2322, by allocating the burden of loss, give owners an economic incentive to effect such repairs.
That incentive would be destroyed if owners are held strictly liable when repairmen are injured by the very condition they are hired to repair. Repair operations increase the owner's exposure by focusing activity on the defective part of the structure. The owner cannot avoid strict liability by depending on the independent contractor to protect the safety of his employees as he might in a negligence action. Thus, the owner in effect would become an involuntary workers' compensation insurer. This would increase the cost of effecting repairs, deterring owners from maintaining socially and economically valuable structures. Subjecting repairmen to the risks involved in a given operation is a reasonable course of action, for they are presumptively cognizant of those risks and are able to minimize them." (Footnotes omitted.)
We find the observations made by Judge Rubin are well stated and embraced by our jurisprudence. The Ladue holding was not a departure from our jurisprudence. The body of jurisprudence that has developed under this issue does not favor a repairman claiming damages from an owner under strict liability for injuries caused directly from the defect, vice or ruin being repaired, as this would have a discouraging effect upon owners to make necessary repairs. As observed by Judge Rubin, this rationale is implied in LSA-C.C. Art. 2322 when it states: "The owner of a building is answerable for the damage occasioned by its ruin, when this is caused by the neglect to repair it ..."
It is well recognized that the application of strict liability must follow a weighing of moral, social and economic values and the ideal of justice. Entrevia v. Hood, 427 So.2d 1146 (La.1983); Landry v. State, 495 So.2d 1284 (La.1986). In the often quoted case, Entrevia, our Supreme Court stated at 1149:

*1143 "... Since Articles 2317 and 2322 state general precepts and not detailed rules for all concrete cases, it [the imposition of strict liability] becomes the interpreter's duty to decide which risks are encompassed by the codal obligation from the standpoint of justice and social utility. Geny, Method of Interpretation and Sources of Private Positive Law § 174 (Louisiana State Law Institute trans. 2d ed. 1963)." (Emphasis added.)
Our research of this issue firmly establishes that when repairmen are injured while in the act of repairing a vice, defect or ruin for the owner, and are directly injured from the vice, defect or ruin while in the act of repair, the owner is not liable in strict liability.[2] Simply stated, for an owner to be held in strict liability, the vice, defect or ruin being repaired cannot be the sole cause of the repairman's injury; there must be more, e.g., some other defect as in Gary v. Chevron U.S.A., Inc., 940 F.2d 139 (5 Cir.1991). With these principles in mind, we address Union's contention that it is not liable in strict liability.
The facts of the case sub judice do not support any acts of negligence by Union and the jury so found. Celestine was injured directly from the defective handrailing weld that was marked for repair while he was in the act of repairing it. The jury found Union 60% at fault for the defective handrailing that was being repaired. This jury finding was clear error. Celestine argues that strict liability did apply because there was a hidden defect, namely, the weld holding the handrailing to the I-beam did not exhibit rust. We are not persuaded by this argument. The key factor is that the handrailing he was working on at the time of the accident is one that was marked for repair.
The record shows that the handrailings that were selected and marked by Union, with Gulf Coast present, were selected not upon the basis of the appearance of rust alone, but also by the handrailings' looseness caused by their exposure to the salt water. The record shows that some handrailings were hammered upon and shook in the selection process. The record is replete with evidence of the presence of rust on various parts of the platform and the instability of handrails on the platform. Celestine testified that they even pulled a few handrails off by just shaking them. The record further shows that it crossed his mind that one of the handrails might fall. Significantly, Celestine stated that when he was working on the top deck of the platform, before this accident, one of the handrails unexpectedly broke loose and caught his arm between two handrail pipes.
The record clearly supports that the handrailing at issue was selected for repair and that Celestine was directly injured by the handrailing while he was in the act of repairing it. He testified that he began using his cutting torch at the bottom of the plate welded to the I-beam and that he proceeded upward. After using his cutting torch for approximately one minute, Celestine stated that the plate at the end of the handrail where he was working detached from the I-beam and dropped. When this happened, the opposite end of the plate twisted, leaving only a small portion of the plate attached to the I-beam, and that side of the handrail also came down.
He stated that he was 6'1" tall and weighed approximately 200 pounds. He further estimated that the handrail weighed between 80 and 100 pounds. The evidence is undisputed that as Celestine was cutting the plate, his body weight rested against the bottom pipe rail. He likewise testified that normally as he neared the completion of cutting the first end of a plate, he would let his helper or helpers, depending on the number of assistants, know so that they could firmly grab the handrail because he knew that the combination of his weight with that of the handrail would cause the handrail to fall. He surmised that the welds were inadequate or that they did not penetrate sufficiently to hold the five foot section of handrail, thus, the owner was liable in strict liability. We disagree. Celestine was injured from the manner he chose to repair the handrailing *1144 which caused the handrailing welds to break from the I-beam. We find these facts do not present an unreasonable risk of harm for which Union, as owner, is liable in strict liability.
To this extent, we find Celestine's reliance on Gary, supra, distinguishable. In Gary, the repairman fell through a grate in the platform floor which was not identified as one which the worker was hired to replace. Thus, it was clear that the repairman's injuries were caused by a defect in a portion of the offshore platform which he was not asked to repair. Clearly, these are not the facts before us.

JURY INSTRUCTIONS
Since we are reversing the jury's finding of Union's strict liability, we find it appropriate to also address Union's contention that the trial court did not properly instruct the jury. The jury was not instructed by the trial court on our jurisprudential restrictions on an owner's strict liability concerning a repairman. This was reversible error which led the jury to wrongly apply strict liability to Union.
Union assigned as error the trial court's failure to charge the jury according to the ruling in Ladue v. Chevron U.S.A., Inc., supra. It proposed the following jury instruction:
No. 20.
A platform owner owes no duty under Louisiana Civil Code Articles 2317 and 2322 to an independent contractor repairman injured by the very condition he was hired to repair.
No. 21.
Leroy Celestine alleges injury while repairing and replacing a handrail, the very activity he was hired to perform. Accordingly, he has no strict liability claim against defendants under Louisiana Civil Code Articles 2317 and 2322.
The trial court rejected Union's jury instructions, but did permit Union to argue Ladue's holdings in closing argument to the jury. In plaintiff's rebuttal closing argument, it was pointed out that the trial judge would not so instruct the jury to any exceptions in the law. In instructing the jury, the trial court stated:
"... statements by the lawyers during their arguments is [sic] not evidence and cannot be considered by you as evidence.
* * * * * *
You are required to accept the law as I explain it to you as being the correct law to be applied to this case, even if you do not believe that it is or that it ought to be the law, and even though it compels a result which is different from that which you would prefer."
The jury was fully instructed on strict liability. Among other principles of strict liability, the trial court stated:
* * * * * *
"A vice or a defect is defined as a condition of a thing which creates an unreasonable risk of injury to another. The word defect implies an imperfection or a deficiency which exists with relative permanence in the thing as one of its qualities. The custodian of the thing cannot escape liability by claiming that he was ignorant of the defect, or that the defect was difficult to discover. He has an affirmative duty to discover any unreasonably dangerous conditions of the things, and to either correct those conditions, or warn potential injured persons of their existence, once they become known to him, the owner.
A person who is rightfully in or near such a building has the duty to see and avoid only obvious hazards. In deciding the reasonableness of the person's conduct, you should consider all of the circumstances in the case.
A thing or a building is not considered defective just because it gives rise to an injury on a particular occasion in question. The mere fact that an accident occurred does not establish a presumption of the defect."
It is apparent the jury properly disregarded Union's comments as instructed by the trial court concerning Ladue's holdings and found in Celestine's favor in strict liability for a premises defect. Under these circumstances, we find the jury instructions were incomplete and the trial court should have instructed the jury as to the jurisprudential *1145 interpretation of when an owner is not liable in strict liability to a repairman. If the trial court did not agree with the jury instructions submitted by Union on this issue, it would have been appropriate to so instruct the jury with its own instructions to cover the issue. The trial court recognized these principles in its reasons for ruling when it rejected Union's motion for JNOV and stated:
"The rule of law in strict liability cases under Article 2317 of the Civil Code does not clearly establish a separate test for repairmen who are injured by a defect in the premises. The general rule applies that, where the risk of harm is clear and obvious, or where the repairman is aware of the danger, then recovery under strict liability is not allowed. Eldridge v. Bonanza Family Restaurant, 542 So.2d 1146 (La.App. 3 Cir.1989); Desormeaux v. Audubon Insurance Co., 611 So.2d 818 (La. App. 3 Cir.1992). Neither is the repairman allowed to recover when the unsafe manner of repair chosen by him is the cause of his injury. Stoute v. South Carolina Ins. Co., 524 So.2d 879 (La.App. 3 Cir.1988).
Whether the danger was obvious, whether the plaintiff was aware of its existence, and whether the manner of repairing the railing was unsafe are all questions of fact for the jury to determine. From the evidence adduced at trial, it cannot be said that reasonable minds could not possibly differ in making these determinations. The defendant's motion for judgment notwithstanding the verdict is denied."
Under the facts of this case, it was reversible error for the trial court not to instruct the jury on the principles involved in strict liability concerning a repairman.

UNION'S NEGLIGENCE
We now turn to Celestine's contention that the jury erred in finding that neither Union nor its employees were negligent.
Celestine argues that through the testimony of its safety expert, Robert Owens, he established that Union failed to hold a safety preconstruction meeting to discuss compliance with federal safety regulations and further that it failed to provide a crane or some other device to support the weight of the handrails. He contends that Union was responsible as a principal for the personal negligence to employees of an independent contractor, that Union was negligent for its failure to follow federal regulations, and that it is vicariously liable for the negligence of an independent contractor.
From the outset, there was conflicting testimony about Celestine's request of Union employees to use some mechanical device to support the handrails as they were cut from the I-beams. Likewise, reference was made by Union and its employees to meetings to discuss the project and safety. Celestine denied these assertions. Considering the conflicting nature of testimony on these particular questions, we cannot say that the jury was clearly wrong in resolving these conflicts contrary to Celestine's assertions.
Referring to Union's personal negligence, Celestine relies on Prosser & Keaton on Torts, 5th Edition, 1984, at page 510, for the proposition that an employer of an independent contractor may be liable for negligence if it fails to exercise reasonable care to prevent activities or conditions which are dangerous to invitees, e.g., a repairman. In an ancillary argument, Celestine refers to general language in various federal regulations which provide that Union is responsible to provide a safe work place.
As background for the assessment of Celestine's argument, we find it appropriate to highlight the basis for Prosser & Keaton's rule of law which they espouse. At page 510, they state:
"Where there is a foreseeable risk of harm to others unless precautions are taken, it is his [the employer's] duty to exercise reasonable care to select a competent, experienced, and careful contractor with the proper equipment, and to provide, in the contract or otherwise, for such precautions as reasonably appear to be called for."
Applying these factors to the present case, we find the record void of any evidence that Gulf Coast was incompetent. To the contrary, the evidence shows that Gulf Coast had performed this type work under contract *1146 with Union since 1979. As evidence of its expertise in this area, Union's contract specifically provided that Gulf Coast would supply its own crew and foreman/pusher for the supervision of the project and that Gulf Coast retained the control and directed the performance of the details of the work. Moreover, Gulf Coast, not Union, contracted to furnish the equipment and personnel to perform the services of the contract.
Utilizing these criteria, we cannot say that the jury, when evaluating Union's responsibility to provide a safe work place, was manifestly erroneous in its conclusion that neither Union nor its employees were negligent.
Finally, Celestine contends that Union was vicariously liable for the negligence of its independent contractor, Gulf Coast. As correctly pointed out by Celestine, Union would only be vicariously liable for Gulf Coast's negligence if Union contracted with Gulf Coast to perform ultrahazardous activities or if it exercises operational control over those acts or authorizes an unsafe practice. After reviewing the record before us, it is apparent that Gulf Coast was not performing ultrahazardous activities and Union did not exercise operational control over Gulf Coast's activities which it contracted to perform.

CONCLUSION
In view of our reversal of the trial court judgment against Union in strict liability and our affirmation of the jury's finding that neither Union nor its employees were negligent, we also reverse the trial court judgment in favor of the intervenors, Gulf Coast Marine Fabricators, Inc., and Highlands Insurance Company, for reimbursement of worker's compensation benefits, and dismiss their intervention with prejudice.
For the foregoing reasons, the judgment of the trial court on the issue of negligence is affirmed. The judgment on the strict liability of Union is reversed and set aside, and IT IS ORDERED, ADJUDGED AND DECREED that there be judgment herein in favor of Union Oil Company of California and against Leroy Celestine, dismissing Celestine's suit with prejudice. IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the judgment in favor of the intervenors, Gulf Coast Marine Fabricators, Inc., and Highlands Insurance Company, for worker's compensation benefits paid to Leroy Celestine in the sum of $102,431.50 (less deductions or credits that was allowed by law, plus such interest that was allowed by law) is hereby vacated and set aside, and the intervention is hereby dismissed with prejudice. Costs of trial and this appeal are assessed to Leroy Celestine.
AFFIRMED IN PART, REVERSED IN PART, AND RENDERED.
NOTES
[1] Union also urges us to follow Desormeaux v. Audubon, 611 So.2d 818 (La.App. 3rd Cir.1992), writs denied, 613 So.2d 966, 1002 (La.1993). In Desormeaux, we reversed a district court's finding of an owner's strict liability when a roof repairman was injured repairing a defective roof. Our analysis in Desormeaux was under the principles found in victim fault. Since we are not going to analyze the case sub judice under victim fault, we will simply state that Desormeaux, and the jurisprudence relied upon therein, are correct statements of law, but to be clearer, we will analyze the facts sub judice in a more simple context of whether an owner is liable in strict liability to a repairman for injuries directly caused from the defect, vice or ruin being repaired.
[2] In making this statement, we recognize that an exception would be made for repairmen involved in ultrahazardous activities. See, Langlois v. Allied Chemical Corporation, 258 La. 1067, 249 So.2d 133 (1971).