hCARTER, Judge.
This is an appeal from a trial court judgment in a consolidated action arising out of an automobile accident.

FACTS

On or about April 16, 1991, Linda Watson was traveling north on Louisiana Highway 24 (also known as West Park Avenue) towards the intersection with Oakshire Drive in Hou-ma, Louisiana. At about the same time, Ron Underdonk was traveling west on Oakshire Drive toward the intersection with Louisiana Highway 24. At the time, Underdonk was operating an automobile owned by Daniel Rhodes. Michelle Rhodes was a guest passenger in the Rhodes automobile.
The intersection of Louisiana Highway 24 and Oakshire was controlled by a semaphore traffic control signal. As Underdonk approached the intersection of Louisiana Highway 24 and Oakshire Drive, the westbound lane of Oakshire was controlled by a green traffic light, and the traffic signal for the northbound lane of Louisiana Highway 24 was also green. As Underdonk entered the intersection, the vehicle he was operating was struck by the vehicle operated by Watson. As a result of this collision, Michelle Rhodes and Linda Watson sustained injuries.
On July 12, 1991, Daniel and Judy Rhodes filed an action for damages[1] against the State of Louisiana, through the Department of Transportation and Development (DOTD) and the State of Louisiana, through the Department of Public Safety and Corrections (DPS). The Rhodes alleged that DOTD was negligent in failing to properly inspect and maintain the traffic control signal, in failing to utilize procedures to assure the proper functioning of the traffic control signal, and in failing to warn of the known hazard. The Rhodes also alleged that DPS was negligent in failing to report the malfunctioning traffic control signal and in failing to promptly respond upon receipt of a ^report of the malfunctioning of the traffic signal. The Rhodes also alleged that DOTD was strictly liable for the defective condition of the traffic control signal.
On July 25, 1991, Linda and Bob Watson filed an action for damages against DOTD and DPS, alleging that they were negligent with regard to the inspection and maintenance of the traffic control signal and in failing to warn and report the malfunctioning traffic control signal, respectively. The Wat-sons also alleged that DOTD was strictly liable for the defective condition of the traffic control signal.
By motions and orders, dated August 20, 1991, and September 13, 1991, respectively, the two matters were consolidated for trial.
DOTD and DPS answered the petitions, denying the allegations of each petition and alleging that Watson was negligent and that her negligence was a cause in fact of the damages.
By petition, filed May 15, 1992, Louisiana Farm Bureau Casualty Insurance Company (Farm Bureau), automobile liability insurer of the Rhodes vehicle, intervened in the proceedings, naming as defendants DOTD, DPS, and the Rhodes. Farm Bureau alleged that it made payments under the medical payments coverage of its policy on behalf of Michelle Rhodes and was legally and conventionally subrogated to any rights the Rhodes may have with regard to those items of damage.
After a trial on the merits, the trial court determined that, although DOTD was negligent with regard to its maintenance and care of traffic signals, Rhodes and Watson were unable to overcome the burden placed on them by LSA-R.S. 9:2800. Accordingly, the trial court rendered judgment, on March 4, 1994, in favor of DOTD and DPS, dismissing the suits of the Rhodes and the Watsons at their costs.
Thereafter, on March 16,1994, the Rhodes filed a motion for leave of court to file an amended petition for damages. Attached to *656 its motion was the amended petition. In their amended petition, the Rhodes alleged that LSA-R.S. 9:2800 is unconstitutional. On March 22,1994, the Rhodes filed a motion for new trial on the basis that LSA-R.S. 9:2800 is unconstitutional. Thereafter, the Watsons and Farm Bureau also filed a motion for leave of court to file an amended petition of intervention and a motion Lfor new trial, alleging the same grounds as were set forth in the Rhodes’ motions and amended petition.
After a hearing, the trial court denied the motions for leave of court to file amended pleadings and denied the motions for new trial. In denying the motions to amend, the trial court stated that the pleadings could not be amended after judgment was rendered. In denying the motions for new trial, the trial court stated that the constitutionality of LSA-R.S. 9:2800 could be argued to the appellate court.
From these adverse judgments, the Rhodes, the Watsons, and Farm Bureau appeal, assigning the following errors:
1. The trial court erred in finding that the Department of Transportation and Development was negligent, but that plaintiffs had failed to overcome the burdens of Louisiana Revised Statute 9:2800.
2. The trial court erred in failing to find that the Department of Transportation and Development was strictly liable.
3. The trial court erred in failing to find that the Department of Public Safety and Corrections was negligent.
4. The trial court erred in failing to grant a new trial.
5. The trial court erred in failing to find Louisiana Revised Statute 9:2800 unconstitutional.

AMENDMENT OF PLEADINGS

LSA-C.C.P. art. 1151 provides, in pertinent part, as follows:
A plaintiff may amend his petition without leave of court at any time before the answer thereto is served. He may be ordered to amend his petition under Articles 932 through 934. A defendant may amend his answer once without leave of court at any time within ten days after it has been served. Otherwise, the petition and answer may be amended only by leave of court or by written consent of the adverse party.
The general rule regarding amendments after an answer is filed is that the trial judge has much discretion in such matters, and his ruling will not be disturbed, except where a manifest abuse of discretion has occurred and indicates a possibility of resulting injustice. Jeffries v. Estate of Pruitt, 598 So.2d 379, 386 (La.App. 1st Cir.), writs denied, 599 So.2d 306 and 605 So.2d 1124 (La. 1992); First Guaranty Bank v. Pineywood Partnership, 569 So.2d 209, 213 (La.App. 1st Cir.1990). Moreover, the right of a party to substantially amend his pleadings during trial is also a matter within the sound discretion of the trial court. LSA-C.C.P. art. 1151; Friday v. Mutz, 483 So.2d 1269, 1271 (La. App. 4th Cir.1986).
However, when the case has been tried and judgment has been rendered, there is no longer a pending petition to be amended. Booth v. Allstate Insurance Company, 466 So.2d 703, 705 (La.App. 4th Cir.1985). As the court noted in Booth, LSA-C.C.P. art. 1151 cannot be construed to authorize the filing of an amendment to a petition which has been fully disposed of by the court with a final judgment. The only remedies available at this stage of the proceedings are to apply for a new trial or to take an appeal. Loupe v. Circle, Inc., 545 So.2d 694, 695 (La.App. 5th Cir.1989); Booth v. Allstate Insurance Company, 466 So.2d at 705.
In Templet v. Johns, 417 So.2d 433, 435-36 (La.App. 1st Cir.), writ denied, 420 So.2d 981 (La.1982), the court stated:
After rendition of final judgment, the Code of Civil Procedure clearly spells out the rights of the appellants. They may either apply for new trial or appeal from an adverse judgment. No where in the Code is the amendment of a dismissed petition after final judgment allowed....
⅝ ⅜ ⅜: # ⅜ ⅜
*657 The La.Code Civ.P. provides that the only rights available to a party whose suit has been dismissed is to request a new trial or to appeal. It is abundantly clear that a trial court can not change or alter this by improvidently signing an order to allow the filing of a supplemental and amending petition.
In the instant ease, after the trial of the merits was concluded and the trial judge had rendered and signed the judgment, the Rhodes, the Watsons, and Farm Bureau filed motions for leave of court to amend their pleadings to raise the issue of the constitutionality of LSA-R.S. 9:2800. At this stage of the proceedings, the pleadings could not be amended, and the trial judge did not err in refusing to grant the parties leave of court to file an amended petition.

1„DENIAL OF NEW TRIAL

LSA-C.C.P. art. 1972 provides as follows:
A new trial shall be granted, upon contradictory motion of any party, in the following cases:
(1) When the verdict or judgment appears clearly contrary to the law and the evidence.
(2) When the party has discovered, since the trial, evidence important to the cause, which he could not, with due diligence, have obtained before or during the trial.
(3) When the jury was bribed or has behaved improperly so that impartial justice has not been done.
In addition to the above, a discretionary ground for a new trial is set forth in LSA-C.C.P. art. 1973, which authorizes a trial court to grant a new trial in any case if there is good ground therefor. Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544 c/w 92-1545, (La.App. 1st Cir. 3/11/94), 634 So.2d 466, 492, writ denied, 94-0906 (La. 6/17/94), 638 So.2d 1094; Garrett v. Universal Underwriters, 586 So.2d 727, 729 (La.App. 3rd Cir. 1991). Louisiana jurisprudence is clear that a new trial should be ordered when the trial court, exercising its discretion, is convinced by its examination of the facts that the judgment would result in a miscarriage of justice. Northshore Insurance Agency, Inc. v. Far-ris, 634 So.2d 867, 872 (La.App. 1st Cir.1993); Tudela v. Broussard, 581 So.2d 1068, 1069-70 (La.App. 5th Cir.1991).
The trial judge has much discretion in determining whether to grant a motion for new trial. LSA-C.C.P. art. 1971; Belle Pass Terminal, Inc. v. Jolin, Inc., 92-1544 c/w 92-1545, (La.App. 1st Cir. 3/11/94), 634 So.2d at 493. The denial of a motion for new trial should not be reversed absent an abuse of that discretion. Fletcher v. Langley, 93-624 (La.App. 3rd Cir. 2/2/94), 631 So.2d 693, 695, writ denied, 94-0521 (La. 4/7/94), 635 So.2d 1139; Gibson v. Bossier City General Hospital, 594 So.2d 1332, 1336 (La.App. 2nd Cir. 1991).
In the instant case, the trial court denied the motions for new trial, finding that the issue of the constitutionality of LSA-R.S. 9:2800 could be addressed for the first time by the appellate court. However, the law is clear that the constitutionality of a statute _J¿must first be questioned in the trial court, not in the appellate court. Lemire v. New Orleans Public Service, Inc., 458 So.2d 1308, 1311 (La.1984); State v. Albritton, 610 So.2d 209, 212 (La.App. 3rd Cir.1992); Hodges Ward Purrington Properties v. Lee, 601 So.2d 358, 360 (La.App. 5th Cir.1992); Travers-Wakeford v. St. Pierre, 585 So.2d 580, 583 (La.App. 4th Cir.1991), writ denied, 592 So.2d 409 (La.1992).
We also note that the claim of unconstitutionality must be specifically pleaded in a proceedings in which the Attorney General is served. Vallo v. Gayle Oil Company, Inc., 94-1230, p. 7 (La. 11/30/94), 646 So.2d 859, 864; Taylor v. Giddens, 618 So.2d 834, 843 (La.1993); Lemire v. Orleans Public Service, Inc., 458 So.2d at 1311 (La.1984); State v. Albritton, 610 So.2d at 212; Travers-Wakeford v. St. Pierre, 585 So.2d at 583. See Thompson v. Capital Steel Company, 621 So.2d 1101, 1108 (La.App. 1st Cir.1992). As noted by the Louisiana Supreme Court in Chamberlain v. State, Department of Transportation and Development, 624 So.2d 874, 877 (La.1993), LSA-C.C.P. art. 1880 contemplates that the attorney general will be served and be given an opportunity to be heard and to participate in the case in a *658 representative capacity. In Chamberlain, the court determined that notice via certified mail prior to the lodging of the matter with the court of appeal and the exercise of the attorney general’s discretion as evidenced by his representation of the state before the appellate and the supreme court satisfied the requirements of LSA-C.C.P. art. 1880.
In the instant case, all three motions for new trial specifically raise the issue of the constitutionality of LSA-R.S. 9:2800 as the sole grounds upon which the motions for new trial were filed. Moreover, the pleadings show that the attorney general was served with the motions to amend the pleadings and the motions for new trial. Although the attorney general did not file any responsive pleadings or appear at the hearing on the motions or file a brief with this court, we find that the notice requirements set forth in LSA-C.C.P. art. 1880 have been met. Therefore, we find that the issue of the constitutionality of LSA-R.S. 9:2800 was properly before the trial court on the motions for new trial.
We have examined the record of this trial to determine whether the trial court abused its discretion in not granting the motions for new trial. We find that a miscarriage |gof justice would result in the instant case if the issue of the unconstitutionality of LSA-R.S. 9:2800 is not addressed. Accordingly, the trial court abused its discretion in failing to grant the motions for new trial to address the issue of the constitutionality of LSA-R.S. 9:2800.

UNCONSTITUTIONALITY OF LSA-R.S. 9:2800

The provisions of the Louisiana constitution serve as limitations on the otherwise plenary power exercised by the legislature. Polk v. Edwards, 626 So.2d 1128, 1132 (La.1993); Board of Directors of Louisiana Recovery District v. All Taxpayers, Property Owners, and Citizens of State of Louisiana, 529 So.2d 384, 387 (La.1988). This structure is unlike the federal constitution which grants powers. Chamberlain v. State, Department of Transportation and Development, 624 So.2d at 879. As a result, the legislature may enact any legislation not prohibited by the Constitution. Polk v. Edwards, 626 So.2d at 1132; Board of Directors of Louisiana Recovery District v. All Taxpayers, Property Owners, and Citizens of State of Louisiana, 529 So.2d at 387. See Board of Commissioners of Orleans Levee District v. Department of Natural Resources, 496 So.2d 281, 286 (La.1986). A corollary to these precepts is the notion that all statutory enactments are presumed to be constitutional. Polk v. Edwards, 626 So.2d at 1132. Unless the fundamental rights or privileges of a person are involved, a strong presumption exists that the legislature in adopting the legislation has acted within its constitutional authority. Board of Directors of Louisiana Recovery District v. All Taxpayers, Property Owners, and Citizens of State of Louisiana, 529 So.2d at 387.
The party challenging the constitutionality of a statute bears the burden of proving clearly that the legislation is unconstitutional. Specifically, the party must rely upon a constitutional provision, which restricts the power of the legislature to enact the particular legislation, and establish that the legislation is barred by such provision. Chamberlain v. State, Department of Transportation and Development, 624 So.2d at 879; Polk v. Edwards, 626 So.2d at 1132; In the Matter of American Waste & Pollution Control Co., 588 So.2d 367, 373 (La.1991). Such constitutional limitations may be express or implied. Chamberlain v. State, Department of Transportation and laDevelopment, 624 So.2d at 879. Any doubt as to the constitutionality of the statute must be resolved in favor of constitutionality. Polk v. Edwards, 626 So.2d at 1132; Recovery District v. All Taxpayers, Property Owners, and Citizens of State of Louisiana, 529 So.2d at 387.
The Rhodes, the Watsons, and Farm Bureau contend that LSA-Const. art 12, § 10(A) creates a constitutional right to sue the state in tort, which right cannot be legislatively curtailed. The parties contend that the constitutional provision mandates a complete waiver of sovereign immunity for the state in tort. As such, the parties reason that this constitutional provision precludes the legislature from enacting any legislation *659 which limits the liability of the state in tort liability.
DOTD and DPS contend that LSA-R.S. 9:2800 does not attempt to reimpose sovereign immunity in contravention of LSA-Const. art. 12, § 10(A). DOTD and DPS reason that LSA-R.S. 9:2800 merely modifies LSA-C.C. art. 2317. According to DOTD and DPS, LSA-C.C. art. 2317 is a legislative enactment which outlines the circumstances under which a tort arises. Similarly, LSA-R.S. 9:2800 merely outlines the parameters of a tort by a public body. DOTD and DPS argue that the legislature has the clear authority to make such a determination, even as it applies to a publie body.
In the instant ease, in order to determine whether LSA-R.S. 9:2800 is unconstitutional, we must determine initially whether the constitution limits the legislature, either expressly or impliedly, from enacting the statute at issue.
LSA-Const. art. 12, § 10(A) addresses immunity in contract and tort and provides as follows:
Neither the state, a state agency, nor a political subdivision shall be immune from suit and liability in contract or for injury to person or property.
In 1978, the Louisiana Supreme Court, in Segura v. Louisiana Architects Selection Board, 362 So.2d 498 (La.1978), discussed whether a previously enacted statutory provision exempting the state from the payment of costs in judicial proceedings[2] [ ipwas superseded by the adoption of LSA-Const. art. 12, § 10(A). In refusing to give effect to the statutory provision, the court reasoned that “[i]f the State has no immunity from suit or liability in contract under the Constitution, it is not immune from payment of costs of court incurred by the party who prevails in such a suit against the State, and any statutory enactment to the contrary must succumb to this constitutional proposition.” Segura v. Louisiana Architects Selection Board, 362 So.2d at 499.
Thereafter, in Chamberlain v. State, Department of Transportation and Development, 624 So.2d at 880-81, the Louisiana Supreme Court addressed the issue of the constitutionality of a statutory provision which placed a ceiling on non-economic damages[3] under LSA-Const. art. 12, § 10(A). Examining the meaning of LSA-Const. art. 12, § 10(A) in light of the historical evolution of the Louisiana constitutional provision on sovereign immunity, the court noted that “Section 10(A) sets forth a mandatory prohibition against sovereign immunity in tort and contract suits.” Chamberlain v. State, Department of Transportation and Development, 624 So.2d at 881. The court also acknowledged that, while the legislature can enact procedure requirements for enforcing the right to sue granted under Section 10(A) because the constitution mandates that the legislature do so, “the legislature cannot enact substantive requirements that would curtail, abridge, impair or burden the exercise of such constitutionally conferred right.” Chamberlain v. State, Department of Transportation and Development, 624 So.2d at 882. Utilizing this rational, the court in Chamberlain determined that the statutory ceiling on general damages imposed by the statutory provision conflicted with LSA-Const. art. 12, § 10(A) and was, therefore, unconstitutional.[4]
| nMore recently, in Rick v. State, Department of Transportation and Development, 93-1776 c/w 93-1784 (La. 1/14/94), 630 So.2d 1271, 1277, the Louisiana Supreme Court addressed the constitutionality of a statutory provision limiting pre-judgment interest on *660 personal injury and wrongful death claims against governmental defendants to six percent.[5] Citing Segura v. Louisiana Architects Selection Board, 362 So.2d 498, and Chamberlain v. State, Department of Transportation and Development, 624 So.2d 874, the court held that the limitation conflicted with LSA-Const. art. 12, § 10(A).
The language of LSA-Const. art. 12, § 10(A) is clear that no state agency is immune from tort liability for injury to persons or property, and the legislature is expressly prohibited from enacting legislation which places any limitation on this clear mandate. Therefore, in order to determine whether LSA-R.S. 9:2800 is unconstitutional, we must determine whether that statute places an unconstitutional limit on the prohibition against sovereign immunity.
LSA-R.S. 9:2800 was enacted by Acts 1985, No. 454 and was one of several statutory measures taken by the legislature to relieve the state of some of the ordinary burdens of tort liability. See Chamberlain v. State, Department of Transportation and | development, 624 So.2d at 878.[6] As enacted by Act 454, LSA-R.S. 9:2800 provided as follows:
A. A public entity is responsible under Civil Code Article 2317 for damages caused by the condition of buildings within its care and custody.
B. Except as provided for in Subsection A of this Section, no person shall have a cause of action based solely upon liability imposed under Civil Code Article 2317 against a public entity for damages caused by the condition of things within its care and custody unless the public entity had actual or constructive notice of the particular vice or defect which caused the damage prior to the occurrence, and the public entity has had a reasonable opportunity to remedy the defect and has failed to do so.
I13C. Constructive notice shall mean the existence of facts which infer actual knowledge.
D. A violation of the rules and regulations promulgated by a public entity is not negligence per se.
E. “Public entity” means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions.[7]
*661 The jurisprudence interpreting this provision reveals that, in a strict liability action against a public entity, the plaintiff must prove that the defendant had actual or constructive knowledge of the vice or defect and failed to remedy it within a reasonable period of time. Ryland v. Liberty Lloyds Insurance Company, 93-1712 (La. 1/14/94), 630 So.2d 1289, 1300; Lutz v. City of Shreveport, 25,801 (La.App. 2nd Cir. 5/4/94), 637 So.2d 636, 638, writ denied, 94-1487 (La. 9/23/94), 642 So.2d 1294; Soileau v. Southern Pacific Railroad, 93-1064 (La.App. 3rd Cir. 4/20/94), 640 So.2d 417, 422; Harig v. State, Board of Elementary & Secondary Education, 25,702 (La.App. 2nd Cir. 3/30/94), 635 So.2d 485, 489; Smith v. State Department of Public Safety, 620 So.2d 1172, 1182 (La.App. 1st Cir.1992); Nicholes v. St. Helena Parish Police Jury, 604 So.2d 1023, 1027 (La.App. 1st Cir.), unit denied, 605 So.2d 1378 (La.1992); Tatum v. State, Department of Transportation & Development, 602 So.2d 1091, 1092 (La.App. 1st Cir.), unit denied, 607 So.2d 563 (La.1992).
In a typical negligence case against the owner of a thing which is actively involved in the causation of injury, the claimant must prove that something about the thing | i4created an unreasonable risk of injury that resulted in damage, that the owner knew or should have known of that risk, and that the owner nevertheless failed to render the thing safe or to take adequate steps to prevent the damage caused by the thing. Kent v. Gulf States Utilities Company, 418 So.2d 493, 497 (La.1982). Under traditional negligence concepts, the knowledge (actual or constructive) gives rise to the duty to take reasonable steps to protect against injurious consequences resulting from the risk, and no responsibility is placed on the owner who acted reasonably but nevertheless failed to discover that the thing presented an unreasonable risk of harm. Kent v. Gulf States Utilities Company, 418 So.2d at 497.
However, in a typical strict liability ease, the claimant is relieved of proving that the owner knew or should have known of the risk involved. The claimant must still prove that under the circumstances the thing presented an unreasonable risk of harm which resulted in the damage or that the thing was defective. The resulting liability is strict in the sense that the owner’s duty to protect against injurious consequences resulting from the risk does not depend on actual or constructive knowledge of the risk, the factor which usually gives rise to a duty under negligence concepts. Under strict liability concepts, the mere fact of the owner’s relationship with and responsibility for the damage-causing thing gives rise to an absolute duty to discover the risks presented by the thing in custody. Kent v. Gulf States Utilities Company, 418 So.2d at 497. If the owner breaches that absolute duty to discover, he is presumed to have discovered any risks presented by the thing in custody, and the owner accordingly will be held liable for failing to take steps to prevent injury resulting because the thing in his custody present ed an unreasonable risk of injury to another. Kent v. Gulf States Utilities Company, 418 So.2d at 497.
The basic difference between these theories of liability is that under LSA-C.C. art. 2315 it must be shown that the owner or person in custody either knew or should have known of the risk whereas under LSA-C.C. art. 2317, a claimant is relieved of proving the defendant’s scienter. Celestine v. Union Oil Company of California, 93-1330 (La. App. 3rd Cir. 5/4/94), 636 So.2d 1138, 1141, unit granted, 94-1868 (LaiJu;ll/ll/94), 644 So.2d 660; Nicholes v. St. Helena Parish Police Jury, 604 So.2d at 1027. This was historically true as to all defendants, including all public and private defendants. However, by enacting LSA-R.S. 9:2800B in 1985, the legislature removed public entities from the common realm of all other defendants in a strict liability action. In so doing, the legislature imposed a more stringent requirement on a plaintiff in a strict liability action against a “public entity” defendant, namely *662 that the plaintiff must prove that the defendant had actual or constructive knowledge of the vice or defect and failed to remedy it within a reasonable time, even though this requirement is not imposed upon a “private entity” defendant in a similar action.
Thus, LSA-R.S. 9:2800 grants the state a privilege that is not available to similarly situated private parties, namely the heightened burden of proof imposed on plaintiffs seeking recovery under LSA-C.C. art. 2317. The statute partially resurrects sovereign immunity by providing, in essence, that injury inflicted by a governmental tort feasor is not legally cognizable unless the public entity had actual or constructive knowledge of the defect and failed to remedy it within a reasonable time. In other words, when the immunity has been abolished, limiting the liability of a public entity from strict liability only to those situations where the public entity has actual or constructive knowledge partially resurrects sovereign immunity. It follows then that LSA-R.S. 9:2800 B confers an immunity in favor of such “public entity” in contravention of LSA-Const. art. 12, § 10(A).
LSA-R.S. 9:2800 is a clear violation of the abrogation of sovereign immunity. Thus, we conclude that LSA-R.S. 9:2800 conflicts with LSA-Const. art. 12, § 10(A) and is thus unconstitutional.

STANDARD OF REVIEW

Generally, if the appellate court makes a finding that the trial court was manifestly erroneous or that there is a legal error and the record is, otherwise, complete, the appellate court should, if it can, render judgment on the record. In such eases, the appellate court is not subject to the manifest error rule, but decides the case de novo. See Rosell v. ESCO, 549 So.2d 840, 844 n. 2 (La.1989); McLean v. Hunter, 495 So.2d 1161298, 1304 (La.1986); Otto v. State Farm Mutual Automobile Insurance Company, 455 So.2d 1175, 1177-78 (La.1984).
In the instant case, we found that the trial judge abused his discretion in denying the motions for new trial and that LSA-R.S. 9:2800 was unconstitutional, and the record is complete. Therefore, we must decide the case de novo.

LIABILITY OF DOTD

As noted earlier, under the principles of strict liability, the plaintiff must show the following: (1) the thing which caused the damage was in the care, custody, and control of the defendant; (2) that the thing had a vice or defect which created an unreasonable risk of harm; and (3) that the injury was caused by the defect. Sistler v. Liberty Mutual Insurance Company, 558 So.2d 1106, 1112 (La.1990).
In the instant ease, there is no dispute that DOTD had custody of the traffic control signal at the intersection of Louisiana Highway 24 (or West Park Drive) and Oakshire Drive in Houma. Moreover, there is no dispute that the light at the intersection malfunctioned at the time of the accident in that the light for the lanes of travel at the intersection was green for both drivers, namely, Un-derdonk and Watson. The remaining issues are whether the malfunctioning traffic light (1) created an unreasonable risk of injury and (2) caused plaintiffs injuries. The Rhodes and the Watsons alleged in their petitions that the accident was caused solely by the negligence, strict liability, and/or fault of DOTD or DPS.
Duane T. Evans, an expert in traffic engineering, testified on behalf of the Rhodes. Evans testified that the controller on a traffic signal is subject to many electrical and mechanical influences that may cause operational malfunctions. Evans noted that the entire controller system is interrelated and that it must be properly maintained to ensure safe working operation. According to Evans, the particular controller on the traffic signal which malfunctioned in the instant case was a Kentron controller. Kentron controllers are proned to burning contacts and quick cycling.
Evans further testified that proper maintenance can keep contacts from burning out as quickly. When he performed an inspection of the intersection light in | ^February, 1993, Evans observed that the light was functioning properly. However, when he examined the contacts in the controller, the contact was burning and posed a potential problem. Ac *663 cording to Evans, Kentron recommends that the contacts on the controller be checked every six months, but that DOTD records revealed that the maintenance program was inadequate. Moreover, Evans opined that the conflicting green signals were caused by improper maintenance by DOTD.
Dale Falghou was the electrical foreman for DOTD for District 2, which included Ter-rebonne Parish. According to Falghou, every six months he and his crew attempt to perform as much maintenance as possible on every intersection. However, he acknowledged that they were unable to do much because the district is large, and he only had two men working in the area.
According to Falghou, in April, 1991, there was no system to check the lights on a regular basis. Nine months before the accident, in June, 1990, the controller had been inspected when performing a repair on the traffic signal. Falghou testified that, less than three weeks before the accident, his crew had performed maintenance on the traffic signal, but apparently did not check the contacts at that time. On the date of the accident, Falghou’s crew replaced contacts on the traffic signal controlling the intersection; the contacts were shorted out. Falghou also acknowledged that his crew had reported problems with the Kentron controllers and that very little maintenance had been performed at this intersection.
Alfred Joe Martin, Jr., a signal electrician with DOTD, testified that, on April 16, 1991, he replaced a contact and repaired a wire on the controller at the intersection where the accident occurred. Martin testified that, although they are supposed to perform maintenance every six months, they are unable to do so because they have repair work every day. Martin acknowledged that he had experienced problems with Kentron contacts in that they shorted out or went bad. According to Martin, he can tell by looking when a contact is going bad because it starts to pit. However, when he re-lamped the light at the intersection of La. Highway 24 and Oakshire three weeks prior to the accident, the report does not reveal that he cheeked the contacts on the controller.
1 is John Irving Vaughn, a signal engineer with DOTD, testified that there were no real problems with Kentron controllers. According to Vaughn, maintenance is the responsibility of each district; DOTD has no uniform rules for maintenance of the traffic signals, even though the Engineering Directives and Standards Manual provides that DOTD should. Vaughn acknowledged, however, that DOTD did not have any requirement that the controllers on traffic signals be periodically maintained, which includes cheeking the contact every six months and cleaning them with a brush and solvents.
Vaughn also noted that the life of an average controller contact is five to ten years. However, between 1985 and 1992, there were more than six occasions that there were problems with the contacts on a particular light. Vaughn also admitted that, although Kentron recommends use of Kentron replacement parts on its controllers and that Kentron voids the warranty if Kentron parts are not used, DOTD used replacement parts of another supplier to repair Kentron equipment. Because of problems with the contacts on Kentron controllers, Vaughn testified that he had engaged in discussions with Kentron, who were very adamant about proper maintenance. Finally, Vaughn acknowledged that, if a light is performing properly, no maintenance is performed.
Trooper Barry Hebert, the investigating officer, had more than fourteen years of experience with the Louisiana State Police. According to Hebert, a malfunctioning traffic fight is hazardous.
Based upon the evidence presented, it is clear that the malfunctioning traffic fight, which was admittedly in the custody of DOTD, presented an unreasonable risk of injury and caused the injuries to Michelle Rhodes and Linda Watson. In fact, a malfunctioning traffic fight evidencing a green fight to both east and west bound traffic as well as to both north and south bound traffic is one of the most dangerous and hazardous situations that motorists can encounter. Upon observing that he had a green light, the driver of each vehicle assumed that he had the right to, and did, proceed through the intersection. But for the malfunction, *664 which gave both drivers a green light, the accident would not have happened. Based upon the above, we find that DOTD is liable to plaintiffs for their damages.

JisLIABILITY OF DPS

The Rhodes, the Watsons, and State Farm contend that DPS is liable to them for failing to respond to the malfunctioning traffic light. The parties allege that the state police have a duty to patrol and inspect the highways of the state and to respond to information received.
However, even assuming that DPS has a duty to patrol the highways and to respond to reports of malfunctioning traffic signals, we find that DPS did not breach any such duty. The evidence reveals the following:
On April 16,1991, Sterling Avet resided on West Park, approximately one block south of the intersection of La. Highway 24 and Oak-shire Drive. Avet testified that, on that date at approximately 4:50 p.m., he observed the light malfunction on La. Highway 24. When he returned home, shortly before 5:00 p.m., Avet reported the malfunctioning signal to the Houma Police Department. His call was transferred to the Louisiana State Police. According to Avet, fifteen to twenty minutes later, he observed the traffic congestion on La. Highway 24.
Lieutenant Ward Richard, the desk sergeant with the Louisiana State Police, was on duty on April 16, 1991. According to his desk log, Richard worked desk between 6:00 a.m. until 6:00 p.m. Richard testified that his log reflects that a telephone call reporting an auto accident was made at 5:10 p.m. The desk log also reflects a complaint of a malfunctioning traffic light at La. Highway 24 North and Oakshire at 5:35 p.m. Richard explained that there were no other entries on his desk log reporting a light out at that intersection. However, Richard acknowledged that not all calls are logged in the radio operator log, but that any report about a malfunctioning traffic light, if one had been received, should have been included in the log.
Trooper Barry Hebert, the investigating officer, testified that he was dispatched to the accident at approximately 5:10 p.m. from the Louisiana State Police Headquarters, which is located a few miles from the intersection of La. Highway 24 and Oakshire Drive. According to Hebert, he arrived on the scene at approximately 5:22, Lptwelve minutes after being dispatched to the accident. Hebert denied receiving any complaint about the signal earlier that day.
From the time Avet observed the light malfunction at 4:50 p.m., approximately ten minutes elapsed before he reported the malfunction at approximately 5:00 p.m. Within ten minutes of his alleged call, the accident between the Rhodes and Watson vehicles occurred. After the accident was reported, DPS arrived within twelve minutes. After reviewing the entire record, we cannot say that DPS was negligent for failing to respond to the reported malfunction. The response by DPS was prompt under the circumstances presented herein.

DAMAGES

A plaintiff bears the burden of proving the causal connection between an accident and injury (damage) by a preponderance of the evidence. Thomas v. Hartford Insurance Company, 540 So.2d 1068, 1074-75 (La.App. 1st Cir.), writ denied, 542 So.2d 516 (La.1989). A tort-feasor is only liable for damages caused by his negligent act; he is not liable for damages caused by separate, independent, or intervening causes. Thomas v. Hartford Insurance Company, 540 So.2d at 1075. However, a defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Lasha v. Olin Corp., 625 So.2d 1002, 1005 (La.1993); American Motorist Insurance Company v. American Rent-All, Inc., 579 So.2d 429, 433 (La.1991); McCray v. Abraham, 550 So.2d 244, 247 (La.App. 4th Cir.1989).
1. GENERAL DAMAGES
“General damages” involve mental or physical pain or suffering, inconvenience, loss of gratification or intellectual or physical enjoyment, or other losses of lifestyle which cannot be measured definitively in terms of money. Boudreaux v. Farmer, *665 604 So.2d 641, 654 (La.App. 1st Cir.), writs denied, 605 So.2d 1873, 1374 (La.1992). The primary objective of awarding general damages is to restore the injured party in as near a fashion as possible to the state the party was in at the time immediately preceding injury. McCray v. Abraham, 550 So.2d at 248. The factors to be considered in assessing quantum for pain and suffering are severity and duration. White v. Lonqanecker, 93-1122, p. 4 (La.App. 1st Cir. 5/23/94), 637 So.2d 1213, 1215, writ denied; 94-1704 (La. 10/7/94); 644 So.2d 640; Glasper v. Henry, 589 So.2d 1173, 1180 (La. App. 4th Cir.1991), writ denied, 594 So.2d 1315 (La.1992); Anthony v. Hospital Service District No. 1, 477 So.2d 1180, 1186 (La.App. 1st Cir.1985), writ denied, 480 So.2d 743 (La.1986). There is no mechanical rule for determining general damages and the facts and circumstances of each case must control. Boudreaux v. Farmer, 604 So.2d at 654.
A. MICHELLE RHODES
According to the testimony of Michelle and her parents, at the time of the accident, Michelle Rhodes was a seventeen-year-old high school senior, residing with her parents. Prior to the accident, Michelle had no health problems. As a result of the accident, Michelle suffered lacerations of the scalp, myofascial strains of the cervical and thoracic regions, a displaced and an open fracture of the mandible.
Immediately following the accident, Michelle was hospitalized, and surgery was performed to repair her fractured mandible. This was accomplished by the placement of three titanium bone plates and twelve screws. A second surgical procedure was subsequently performed to remove the plates and screws.
Thereafter, Michelle was on a liquid diet, which prevented her from eating anything more substantial than cream potatoes during that time.
Since the accident, Michelle experienced a slight disruption in her bite, sensitivity in her teeth, pain in her chin, at the fracture sites, and in her neck and back, dizziness, and TMJ. Additionally, at the time of trial, Michelle was continuing to suffer from frequent and severe headaches.
Dr. David Crocket Blythe, Jr., a dentist who specializes in oral and maximal fascial surgery, testified that he treated Michelle in the emergency room of Terrebonne General Hospital on April 16, 1991. Dr. Blythe testified that his examination revealed that Michelle sustained two fractures in her lower jaw, had several superficial lacerations to her head, and bruising and swelling. Dr. Blythe presented two options to the Rhodes, namely, surgical treatment to place bone plates in the jaw or wiring the jaw shut. The ^Rhodes selected the surgical treatment, which was, in Dr. Blythe’s opinion, the better choice.
Dr. Blythe testified that, during the surgery, he first addressed the displaced fracture in Michelle’s chin, properly aligning it. Dr. Blythe then adapted small bone plates to fit her jaw and attached the plates to Michelle’s jaw bone with several small screws. He then addressed the open fracture, adapting small bone plates and attaching them with screws. Dr. Blythe utilized three bone plates and twelve screws during the surgery. According to Dr. Blythe, Michelle was discharged from the hospital the following day.
Michelle was required to be on a liquid or semi-solid diet for six weeks so that she would not be required to chew. Dr. Blythe saw Michelle numerous times over the six weeks following her surgery. During those visits, Michelle complained of swelling, numbness in her lip, pain in her chin, and soreness in her front teeth. When Michelle presented complaints regarding her teeth, Dr. Blythe referred her to Dr. Jerome Walker. X-rays taken on June 25, 1991, revealed that the fractures were well-healed and solid.
In October, 1991, Michelle voiced complaints of pain in her chin. She was readmitted for outpatient surgery on November 27, 1991, when Dr. Blythe removed the plates and screws from Michelle’s jaw.
Thereafter, on June 24, 1992, Dr. Blythe again saw Michelle for symptoms of TMJ, including pain and headaches. Dr. Blythe prescribed an anti-inflammatory and a muscle relaxant, which appeared to relieve some of the pain. By August 11, 1992, all of *666 Michelle’s problems appeared to have been resolved.
Dr. Dexter A. Gary, orthopedic surgeon, testified via deposition. Dr. Gary testified that he first examined Michelle on April 30, 1991. The medical history revealed that Michelle had been involved in an automobile accident on April 16, 1991. After an examination, Dr. Gary opined that Michelle suffered a myofascial strain of the paraseapula musculature. He prescribed a non-steroid anti-inflammatory and suggested that she return in six to twelve weeks. On June 24, 1991, Michelle returned to his office with complaints of occasional neck pain. Dr. Gary’s examination yielded normal results. Given Michelle’s persistent complaints of pain, Dr. Gary scheduled an MRI of the cervical andj^thoracic spine, which was performed on July 11, 1991. The MRI of the thoracic was normal, but an MRI of the cervical spine had not been done. As a result, Dr. Gary ordered another MRI, which again yielded normal results. On September 3, 1991, Dr. Gary discharged Michelle from his care without any restrictions. According to Dr. Gary, on October 21, 1991, Michelle called complaining of continued pain and requested additional medication. Dr. Gary testified that he last saw Michelle on January 28, 1992, when she complained of neck pain and dizziness. Dr. Gary opined that she had a myofascial strain and that some of these symptoms were residual from her jaw fracture. Dr. Gary testified that Michelle’s prognosis is excellent and that she will eventually be pain free.
Dr. Jerome Walker, a dentist, testified that he first examined Michelle on January 15, 1992, upon referral from Dr. Blythe. Dr. Walker checked Michelle’s bite and determined that her bite was slightly off. He then examined Michelle in April, 1992, for sensitivity of her teeth and determined that her teeth were not in need of any treatment. Dr. Walker did not examine Michelle after April, 1992.
Based upon the above, we find an award of $100,000.00 to be appropriate.
B. LINDA WATSON
Linda Watson testified that, as a result of the accident, she suffered contusions to her chest and abdomen. She also received a contusion to her knee, as well as numerous lacerations to her feet. Immediately after the accident, Watson was taken to the emergency room. Thereafter, Watson was treated by Drs. Ray A. Cinnater and Thomas H. Givens. Watson testified that the contusion to her abdomen became calcified and had not disappeared as of the date of the trial. Watson described the calcification as approximately two inches in length and one-half to three-quarters of an inch in width, which was located below her naval. According to Watson, after approximately six months, she was able to return to her normal routine.
Bobby Watson testified that his wife, Linda, was in shock when he arrived at the emergency room on the afternoon of April 16.1991. According to Watson, LindaJ^was unable to perform her normal activities for approximately six months following the automobile accident.
Dr. Ray A. Cinnater, a specialist in internal medicine, testified via deposition. Dr. Cinnater testified that he first examined Linda Watson on April 18, 1991. His examination revealed numerous bruises and contusions, including a contusion and bruise approximately six inches by three inches on her abdomen, and lacerations on her right foot. Dr. Cinnater advised Watson to continue taking the prescription medication prescribed by Dr. Givens in the emergency room, but did not place her under any restrictions.
Dr. Thomas H. Givens testified, via deposition, that he initially examined Linda Watson in the emergency room immediately following the automobile accident. Thereafter, on April 25, 1991, Dr. Givens treated Watson in his office. At that time, his examination revealed a contusion of the chest, a large hematoma, and a bum on the lower abdomen. Dr. Givens prescribed medication and advised Watson to apply moist heat to the hematoma on her abdomen. On September 13.1991, Watson still had a large mass where the hematoma was in her abdomen, which Dr. Givens indicated may result in calcifica *667 tion. Dr. Givens indicated that, if the mass remained and presented discomfort or problems, it could be removed.
Based upon the above, we find an award of $10,000.00 to be appropriate.

2.LOSS OF CONSORTIUM

The compensable elements of a claim for loss of consortium of a spouse include loss of love and affection, loss of companionship, loss of material services, loss of support, impairment of sexual relations, loss of aid and assistance, and loss of felicity. Higley v. Kramer, 581 So.2d 273, 282 (La. App. 1st Cir.), writ denied, 583 So.2d 483 (La.1991). See Rossitto v. Jinks, 576 So.2d 1115, 1117 (La.App. 3rd Cir.1991). The elements of a parent’s claim for the loss of service and society are essentially the same, without, of course, the sexual component. See Higley v. Kramer, 581 So.2d at 282.
lasA. DANIEL AND JUDY RHODES
The evidence presented at trial revealed that both parents cared for Michelle after the accident. Judy Rhodes testified that she cared for her daughter daily for almost two months after the accident and had to help her daughter with almost everything. Moreover, prior to the accident, Michelle helped her parents with chores. Since her accident, Michelle has not been able to render assistance because of the pain she suffers.
We have carefully reviewed the entire record in this matter and find that the record supports an award of $3,500.00 to Judy Rhodes and $1,500.00 to Daniel Rhodes for the loss of service and society of their daughter.
B. BOB WATSON
The evidence presented established that, after the accident, Bob Watson assisted his wife with the household chores. Her mother and sister assisted with meal preparation since Mr. Watson was unable to cook. He also testified that he also assisted with transportation for his wife to return to work, dropping her off in the morning and often picking her up in the afternoon. Mr. Watson testified that his personal relationship with his wife was affected in that he had to be careful around Linda because of her injuries.
We have carefully reviewed the entire record in this matter and find that the record supports an award of $2,500.00 to Bob Watson for the loss of consortium of his wife.
3. MENTAL ANGUISH TO THIRD PARTIES
Louisiana jurisprudence supports an award for mental anguish and emotional distress arising out of injury to another when that person comes upon the scene of the event soon thereafter, provided that the trauma suffered by the victim is such that it can be reasonably expected that one in plaintiffs position would suffer serious and foreseeable mental anguish from the experience. LSA-C.C. art. 2315.6; Lejeune v. Rayne Branch Hospital, 556 So.2d 559, 570 (La.1990). Moreover, the court in Lejeune noted that mental anguish for injury to a third person should only be allowed where the emotional injury is both severe and debilitating.
LeWe have carefully reviewed the entire record in this matter. From their testimony, we acknowledge that the Rhodes were understandably upset upon viewing their child at the scene of the accident and shortly thereafter. However, we cannot say that the emotional distress suffered by the Rhodes was severe or debilitating so as to warrant an award for damages for mental anguish to a third party. The same is true of the emotional distress experienced by Bob Watson upon seeing his wife in the hospital shortly after the accident. Therefore, the Rhodes and Watson are not entitled to an award for mental anguish.
4. LOST WAGES
In order to recover for actual wage loss, a plaintiff must prove that he would have been earning wages, but for the accident in question. See Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 522 So.2d 1144, 1152 (La.App. 2nd Cir.1988). In other words, it is the plaintiffs burden to prove past lost earnings and the length of time missed from work due to the accident. *668 ANMAC Foundation, Inc. v. St. Patrick Hospital of Lake Charles, 594 So.2d 951, 956 (La.App. 3rd Cir.1992). Past lost earnings are susceptible of mathematical calculation from proof offered at trial and requires such proof as reasonably establishes the claim. This may consist of the plaintiffs own testimony. McDonough v. Royal Sonesta, Inc., 626 So.2d 438, 440 (La.App. 4th Cir.1993); Woolfarth v. City of New Orleans, 572 So.2d 1194, 1196 (La.App. 4th Cir.1990). However, to allow a plaintiff to recover damages for lost wages when there is no independent support of plaintiffs claim is highly speculative. McDonough v. Royal Sonesta, Inc., 626 So.2d at 440; Hicks v. Barney, 526 So.2d 391, 392 (La.App. 4th Cir.1988). An award for past lost wages is not subject to the much discretion rule. Ammons v. St. Paul Fire and Marine Insurance Company, 525 So.2d 60, 65 (La.App. 3rd Cir.), writ denied, 525 So.2d 1045 (La.1988).
A. MICHELLE RHODES
Michelle Rhodes testified that, at the time of the accident, she was working as a cashier for Winn Dixie. She received a wage of $4.25 per hour and averaged seventeen hours per week. Michelle testified that, although her doctor advised her that |27she could return to work within three weeks after the accident, she did not return to her position with Winn Dixie after the accident. Michelle testified that she simply did not feel well enough to return for more than a year.
Based upon this testimony, we find that the record supports an award of past lost wages for the three weeks when, according to Michelle, she was advised not to return to work by her doctor. Although none of the medical testimony addressed the issue of lost wages, given that Michelle underwent surgery, it is reasonable that she would have been unable to work for the three weeks following the accident. Accordingly, Michelle is entitled to past lost wages in the amount of $216.75.
B. LINDA WATSON
The W-2 wage statements for 1991 and 1992 reveal that Watson earned $1,750.00 less in 1991 than she did in 1992. However, Watson’s testimony revealed that she missed approximately three weeks of work as a result of the injuries she received in the April 16, 1991, automobile accident. Watson testified that she earned approximately $5.00 per hour and worked a forty-hour week. According to Watson, she sustained lost wages of approximately $600.00. Accordingly, we find that Watson is entitled to past lost wages in the amount of $600.00.
5. PAST MEDICAL EXPENSES
A plaintiff may ordinarily recover reasonable medical expenses, past and future, which he incurs as a result of the injury. Dowe v. Grady, 540 So.2d 1040, 1045 (La.App. 2nd Cir.1989). However, a plaintiff must prove the existence of the injuries and a causal connection between those injuries and the accident. The test is whether plaintiff has shown through medical testimony that more probably than not the subsequent medical treatment was necessitated by the trauma suffered in the accident. Jaffarzad v. Jones Truck Lines, Inc., 561 So.2d 144, 156 (La.App. 3rd Cir.), writ denied, 565 So.2d 450 (La.1990); Wells v. Allstate Insurance Company, 510 So.2d 763, 769 (La.App. 1st Cir.), unit denied, 514 So.2d 463 (La.1987).
When a plaintiff alleges that he incurred medical expenses and that allegation is supported by a bill, unless there is sufficient contradictory evidence orj^reasonable suspicion that the bill is unrelated to the accident, it is sufficient to support the inclusion of the item in the judgment. Brightman v. Regional Transit Authority, 543 So.2d 568, 570-71 (La.App. 4th Cir.1989).
A. MICHELLE RHODES
In the instant case, the uncontroverted evidence at trial established that Michelle Rhodes incurred medical expenses as a result of the accident totalling $20,685.14. Therefore, we find that the Rhodes are entitled to an award of past medical expenses in that amount. Farm Bureau is entitled to $5,000.00 of the $20,685.14 on its subrogation claim for the medical payments benefits paid on behalf of Michelle.
*669 B. LINDA WATSON
In the instant ease, the evidence established that Linda Watson incurred medical expenses as a result of the accident totalling $1,586.25 and that Watson is entitled to an award for past medical expenses for that amount.
6. FUTURE MEDICAL EXPENSES
An award for future medical expenses is in great measure highly speculative and is not susceptible of calculation with mathematical certainty. Gaspard v. Breaux, 413 So.2d 288, 292 (La.App. 3rd Cir.1982). However, like any other element of damage, future medical expenses must be established with some degree of certainty. Hunt v. Board of Supervisors of Louisiana State University and Agricultural and Mechanical College, 522 So.2d at 1149. An award for future medical expenses will not be supported in the absence of medical testimony that they are indicated and setting out their probable cost. Brumfield v. Guilmino, 93-0366 (La.App. 1st Cir. 3/11/94), 633 So.2d 903, 908 writ denied, 94-0806 (La. 5/6/94); 637 So.2d 1056.
A. MICHELLE RHODES
With regards to future medical expenses, Dr. Blythe testified that, if Michelle continued to suffer from flare-ups with her TMJ, she would need future medical treatment to address the problem, including orthodontics. Based on the fact that Michelle was experiencing flare-ups more than three years after the accident, Dr. Blythe opined that, 12gwith a reasonable degree of medical certainty, Michelle would need future orthodontic treatment. Dr. Blythe estimated that such expenses would cost approximately $6,000.00.
Based upon this testimony, we find that the record supports a finding that Michelle is entitled to an award of $6,000.00 for future medical expenses.
B. LINDA WATSON
Although Linda Watson testified that she may have to undergo future surgery to remove the calcified mass in her abdomen, the medical testimony suggested that the future surgical procedure is not probable. The record does not support an award for future medical expenses for Linda Watson.
7. PROPERTY DAMAGE
The measure of damages for the value of an automobile is the pre-accident market value, less salvage value. Bonner v. Louisiana Indemnity Company, 607 So.2d 915, 917 (La.App. 2nd Cir.1992).
A. THE RHODES
The testimony and documentary evidence presented at trial established that the 1986 Honda Prelude owned by Daniel and Judy Rhodes was declared a total loss as a result of the April 16, 1991, automobile accident. The value of the vehicle at that time was $7,900.00. Accordingly, damages for property damage are awarded to Daniel and Judy Rhodes in the amount of $7,900.00.
B. THE WATSONS
Similarly, the testimony and documentary evidence presented at trial established that the 1985 Oldsmobile Cutlass owned by Bobby and Linda Watson was declared a total loss as a result of the April 16, 1991, automobile accident. Watson testified that her vehicle was valued at approximately $4,900.00. The documentary evidence presented established that the value of the vehicle at that time was $4,850.00. Accordingly, damages for property damage are awarded to Bobby and Linda Watson in the amount of $4,850.00.
Jao CONCLUSION
For the above reasons, that portion of the judgment of the trial court in favor of DPS and against the Rhodes, the Watsons, and Farm Bureau is affirmed. That portion of the trial court judgment in favor of DOTD and against the Rhodes, the Watsons, and Farm Bureau is reversed. Judgment is rendered as follows:
1. In favor of Michelle Rhodes in the sum of $100,000.00 for general damages, $216.75 for lost wages, and $6,000.00 for future medical expenses;
2. In favor of Daniel and Judy Rhodes in the amount of $15,685.14 for medical ex *670 penses, $7,900.00 for property damages, and $5,000.00, collectively, for loss of consortium;
3. In favor of Linda and Bob Watson in the amount of $10,000.00 for general damages, $600.00 for past lost wages $1,586.25 for medical expenses, $4,850.00 for property damage, and $2,500.00 for loss of consortium; and
4. In favor of Farm Bureau and against DOTD for $5,000.00 for medical expenses.
In all other respects, the judgment of the trial court is affirmed. DOTD is cast for all costs in the amount of $1,691.30.
AFFIRMED IN PART, REVERSED IN PART AND RENDERED.

. Michelle Rhodes subsequently attained the age of majority, and by amended petition, dated April 13, 1992, was added as a plaintiff.

. The statute at issue in Segura v. Louisiana Architects Selection Board, 362 So.2d 498 (La. 1978), was LSA-R.S. 13:4521.

. The statute at issue in Chamberlain v. State, Department of Transportation & Development, 624 So.2d 874 (La.1993), was LSA-R.S. 13:5106(B)(1).

. In Jenkins v. State, Department of Transportation and Development, 625 So.2d 1050 (La.1993), affirmed on remand, 91-2285R (La.App. 1st Cir. 3/11/94), 634 So.2d 7, the Louisiana Supreme Court granted a writ application and reversed an appellate court opinion, which had reduced the general damage award in a tort suit against the state in accordance with LSA-R.S. 13:5106(B)(1). The court remanded the matter for reconsideration of the general damage award in light of Chamberlain.

. The statute at issue in Rick v. State, Department of Transportation and Development, 93-1776 c/w 93-1784 (La. 1/14/94), 630 So.2d 1271, 1277, was LSA-R.S. 13:5112(C).

. In Chamberlain v. State, Department of Transportation and Development, 624 So.2d at 878, n. 6, the Louisiana Supreme Court, in discussing the constitutionality of LSA-R.S. 13:5106(B)(1), noted that, in the 1985 session, the legislature enacted six statutory measures to relieve the state of some of the burdens of ordinary tort liability. In addition to LSA-R.S. 13:5106(B)(1), which imposed a $500,000 ceiling on general damages recoverable in a personal injury action against the state, its agencies, or its subdivisions, and was enacted by Acts, 1985, No. 452, the legislature also enacted the following five acts:
(1) Act No. 450 enacted LSA-R.S. 13:5114(D), authorizing governmental defendants to satisfy personal injury and wrongful death claims by structured payment plans established pursuant to court order or compromise settlement;
(2) Act No. 451 enacted LSA-R.S. 42:1441.1 through 1441.4 and LSA-R.S. 29:23.1, transferring liability for torts committed by public officers who serve at the local level from the state to the particular subdivision the officer serves, and limiting the state’s master-servant liability;
(3) Act No. 453 enacted LSA-R.S. 9:2798.1, precluding governmental entities and their officers and employees from incurring liability for policy-making or discretionaiy acts or omissions;
(4) Act No. 454 enacted LSA-R.S. 9:2800, confirming governmental entities’ liability under LSA-C.C. art. 2317 for damages caused by buildings under their control, but limiting such liability for other things in the custody of governmental entities to situations where the governmental entity had notice of the defect that caused the injury; and
(5) Act No. 509 enacted LSA-R.S. 13:5112(C) and LSA-R.S. 5117, providing for court costs and limiting pre-judgment interest on personal injury and wrongful death claims against governmental defendants to six percent.

.By Acts 1992, No. 581, § 1, LSA-R.S. 9:2800E was amended to provide as follows:
“Public entity” means and includes the state and any of its branches, departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, employees, and political *661 subdivisions and the departments, offices, agencies, boards, commissions, instrumentalities, officers, officials, and employees of such political subdivisions. Public entity also in-eludes housing authorities, as defined in R.S. 40:382(1), and their commissioners and other officers and employees.